**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| KAYLA NICOLE DRAINE, | CASE NO. 1:22-CV-1370 |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Kayla Nicole Draine ("Plaintiff" or "Ms. Draine") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I.      Procedural History

On April 18, 2018, Ms. Draine, through her mother, filed an application for SSI.  (Tr. 281-82.)  She alleged a disability onset date of June 1, 2015.  (Tr. 281.)  She alleged disability due to depression, anxiety, mood disorder, and oppositional defiant disorder.  (Tr. 69-70.)  Ms. Draine's application was denied at the initial level (Tr. 69-90) and upon reconsideration (Tr. 92-111), and she requested a hearing (Tr. 164).  On April 15, 2020, a hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 51-69.)  On May 28, 2020, the ALJ issued an unfavorable decision (Tr. 113-36), which was remanded by the Appeals Council on January 4,

2021.  (Tr. 137-41.)  Ms. Draine had a second hearing before an ALJ on April 6, 2021 (Tr. 33-50), and the ALJ issued an unfavorable decision on July 6, 2021 (Tr. 10-32).  The July 6, 2021 decision was affirmed by the Appeals Council on June 7, 2022, making it the final decision of the Commissioner.  (Tr. 1-3.)  Ms. Draine then filed this pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 8, 9).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Draine was born in 2000 and was 15 years old on the alleged disability onset date; she attained age 18 in June 2018, making her a younger individual under Social Security regulations.  (Tr. 17, 26, 69.)  She had at least a high school education.  (Tr. 26.)  Ms. Draine has not engaged in substantial gainful activity since the alleged onset date.  (*Id.*)

### B.    Medical Evidence

Although the ALJ determined Ms. Draine's eligibility for SSI benefits both before and after her eighteenth birthday (Tr. 13-27), her arguments on appeal focus on medical records and administrative findings relating to her application for adult disability benefits (ECF Doc. 8).  The evidence summarized herein is accordingly focused on treatment after her eighteenth birthday.

#### 1.    Relevant Treatment History

On February 13, 2018, Ms. Draine attended a new patient evaluation with John Adamo, APRN-CNS, to establish psychiatry care.  (Tr. 568-72.)  She was being treated for depression and generalized anxiety disorder/social anxiety, with a history of post-traumatic stress disorder ("PTSD"), taking risperidone 0.5 mg twice daily and Effexor 75 mg twice daily, and seeing Kelly Cunningham for therapy.  (Tr. 568.)  She reported her current medication regimen was effective and that she was fairly compliant with medications.  (*Id.*)  Her reported symptoms

included depressed/irritable mood, diminished interest, insomnia, feeling worthlessness/guilt, inability to make decisions, panic attacks, excessive worry, lingering social anxiety, and separation anxiety.  (Tr. 568-69.)  On examination, Ms. Draine was alert, oriented, calm, and cooperative, with normal motor activity and good eye contact.  (Tr. 570.)  She was euthymic with full affect, and goal-directed with logical thought processes and normal thought associations.  (*Id.*)  She did not report self-harm or aggression, denied suicidal ideations, and demonstrated appropriate memory, intact cognition, and fair insight/judgment.  (Tr. 570-71.)  CNS Adamo diagnosed borderline personality disorder and depression, recurrent.  (Tr. 571.)

Ms. Draine attended therapy sessions with Kelly Cunningham, LISW, on February 5 and 19, 2018.  (Tr. 904-07.)  On February 5, she reported her emotional health was a roller coaster, and that she had just completed the DBT program at Oakview.  (Tr. 906.)  She was avoiding learning to drive and was afraid of high school graduation and college.  (*Id.*)  On mental status examination, LISW Cunningham noted suicidal ideation with no intent, with protective factors present and ongoing suicidal thinking.  (*Id.*)  Ms. Draine reported hearing a voice that told her awful things every day, including that she "shouldn't be here" and that "[e]veryone is better off without me."  (*Id.*)  LISW Cunningham's impression was self-loathing, mistrust, and anger toward others, ongoing suicidality, severe depression, and borderline personality disorder, with a poor prognosis.  (*Id.*)  On February 19, LISW Cunningham provided education about eye movement desensitization and reprocessing ("EMDR"), and Ms. Draine indicated she was frightened about doing it because she was afraid to be triggered.  (Tr. 905.)  On mental status examination, LISW Cunningham observed "some underlying suicidality is always present."  (*Id.*)

Ms. Draine next attended a therapy session with LISW Cunningham on March 5, 2018, while she was hospitalized at Akron Children's Hospital for suicidal statements.  (Tr. 903.)

LISW discussed Ms. Draine's poor prognosis with her mother and advised her mother "to begin the process of filing for disability for [Ms. Draine]."  (*Id.*)  Ms. Draine returned to therapy with LISW Cunningham on March 19, 2019, where she continued to display intense ongoing suicidal thinking and high levels of self-loathing.  (Tr. 902.)  She reported feeling overwhelmed, being bullied at school, and having stomach issues that caused a lack of appetite and nausea.  (*Id.*)  She had two more months until high school graduation.  (*Id.*)

Ms. Draine returned to therapy with LISW Cunningham on April 2, 2018, where she reported a new complaint of physical pain in her whole body; she said she had tried to walk but fell to her knees earlier that week.  (Tr. 901.)  She reported doing well in school and was on spring break.  (*Id.*)  LISW Cunningham noted that Ms. Draine was more open to therapeutic interventions that day, and that her depression appeared better.  (*Id.*)

Ms. Draine met with CNS Adamo for medication monitoring on April 3, 2018.  (Tr. 564-67.)  CNS Adamo noted her recent hospitalization, resulting in a medication change to Lamictal 25 mg twice daily; he noted that change had little positive effect yet, and that Ms. Draine reported fatigue and fogginess.  (*Id.*)  She had reported anxiety and nausea prior to the medication.  (*Id.*)  She denied suicidal ideations at this visit.  (*Id.*)  On examination, she was alert, oriented, and well-groomed, with good eye contact and normal motor activity; she had goal-directed and logical thought processes and associations, and full affect.  (Tr. 566.)  Her mood was euthymic, depressed, irritable, and anxious.  (*Id.*)  Her insight and judgment were fair.  (*Id.*)  CNS Adamo noted the nature of her problem was fluctuating due to new medication.  (*Id.*)  He continued her on Lamictal 25 mg twice daily until April 14, to be increased to 50 mg twice daily thereafter, with a follow up appointment in four to six weeks.  (Tr. 567.)

At an April 16, 2018 therapy session with LISW Cunningham, Ms. Draine reported she had been feeling better.  (Tr. 900.)  LISW Cunningham noted that she appeared stable and had no suicidal ideation or intent at this visit.  (*Id.*)  Ms. Draine was excited and anxious about school being almost over, and hoped to hang out with friends and get her license over the summer.  (*Id.*)

Ms. Draine did not return to therapy until May 21, 2018, when she reported she just graduated from high school and was afraid to manage social interactions at her graduation party.  (Tr. 899.)  She had no suicidal ideation or intent on examination.  (*Id.*)  She reported she was very afraid of being an adult, and terrified to drive and work.  (*Id.*)  She kept repeating that she thought she would be dead by then, so she had no plan for the future and was unable to picture one.  (*Id.*)  LISW Cunningham observed that Ms. Draine was very avoidant about life transitions and indicated she did not see Ms. Draine being able to overcome her fears and borderline personality disorder thinking.  (*Id.*)  LISW Cunningham told Ms. Draine's mother that she thought Ms. Draine was an eligible candidate for SSI benefits.  (*Id.*)

On May 31, 2018, Ms. Draine met with CNS Adamo for medication management and an adult referral.  (Tr. 560.)  She was tolerating 100 mg of Lamictal, but with limited positive effect.  (*Id.*)  Her tiredness and fogginess had diminished, but she reported feeling numb and down.  (*Id.*)  CNS Adamo and Ms. Draine discussed increasing the Lamictal dosage and possibly adding an SSRI, but Ms. Draine reported trying every SSRI except Paxil without success, including Wellbutrin, Effexor, and Cymbalta.  (*Id.*)  Her reported symptoms included personality disorder problems, a depressed and irritable mood, diminished interest, change in appetite, fatigue, feelings of worthlessness and guilt, poor concentration, an inability to make decisions, and chronic low mood; she did not report recent weight changes, insomnia, or suicidal ideation.  (Tr. 561.)  On examination, she was alert and oriented, with mildly dramatic demeanor; she was

5

cooperative and had average eye contact, depressed mood, flat affect, normal attention and concentration, and appropriate memory; she had tangential thought processes and normal thought associations, with poor insight and judgment.  (Tr. 562.)  CNS Adamo's impression was that Ms. Draine's condition was fluctuating due to new medication titration, and he increased her Lamictal to 150 mg.  (Tr. 563.)  Ms. Draine reported looking for work and considering a retail clothing store, but also said her therapist was having her file for disability.  (*Id.*)  CNS Adamo provided information for a transition to an adult care provider.  (*Id.*)

Ms. Drain attended therapy sessions on June 4 and June 18, 2018.  (Tr. 897-98.)  On examination, she continued to demonstrate suicidal ideation with no intent and protective factors present.  (*Id.*)  On June 4, she reported that she managed the social part of her graduation party fairly well, but complained of feeling numb and empty.  (Tr. 898.)  She planned to practice driving that night and get her resume ready for retail jobs.  (*Id.*)  On June 18, she reported family arguments and said she did not see the point of living anymore.  (Tr. 897.)  LISW Cunningham encouraged Ms. Drain's mother to support Ms. Drain in making her own decisions with regard to learning to drive, getting a job, and going to college; Ms. Drain was expressing that it was all too overwhelming for her.  (*Id.*)  LISW Cunningham reported no need for hospitalization, but deterioration since Ms. Draine's last visit.  (*Id.*)

Ms. Draine returned for therapy with LISW Cunningham on July 2, 2018.  (Tr. 896.)  She continued to present with suicidal ideation with no intent, and protective factors present; however, she also reported intrusive thoughts up to five times per hour, telling her she had messed up and needed to die.  (*Id.*)  She was attempting to use her coping skills, but they were being overridden.  (*Id.*)  She also reported she was an anxious mess, felt overwhelmed, was

frightened to keep learning to drive, only wanted to sleep, and was suicidal.  (*Id.*)  LISW Cunningham called Laurelwood Hospital and set up an admission for Ms. Draine.  (*Id.*)

Ms. Draine was admitted to Windsor-Laurelwood Center for Behavioral Medicine from July 2 through July 9, 2018.  (Tr. 440-44.)  She was admitted to the adult unit, with suicide and psychosis precautions every fifteen minutes.  (Tr. 442.)  She was started on Prozac 10 mg daily, Geodon 20 mg at night, and 6 mg melatonin at bedtime; after three days, Prozac was increased to 20 mg daily with Geodon 40 mg at night; Geodon was discontinued on July 7, 2018.  (*Id.*)

At the time of her admission, Ms. Draine admitted a long history of depression and mood instability and said her depressive symptoms and chronic suicidal thoughts recently worsened; she had experienced auditory hallucinations telling her "she should not be alive" and she felt she might act on her suicidal thoughts.  (Tr. 440.)  She had also stopped taking her Lamictal two weeks prior because she felt it was making her mood worse.  (Tr. 440, 446.)  She reported previously taking Prozac, Zoloft, Lexapro, gabapentin, Wellbutrin, and Abilify, with the best results from Prozac.  (Tr. 440.)  Her history was noted to include past psychiatric admissions in 2014, 2017, and March 2018, all for suicide threats.  (Tr. 440, 446.)

Upon admission, she was alert and oriented, made adequate eye contact, and was cooperative with logical and coherent thought processes and intact associations; however, her mood and affect were depressed, her speech was at a decreased rate and volume, and she verbalized suicidal thoughts, reported auditory hallucinations, and demonstrated limited insight and judgment.  (Tr. 448, 450.)  She was compliant with her medications during her stay.  (Tr. 442.)  She reported that Geodon made her sleepy, but helped with her auditory hallucinations.  (*Id.*)  She attended group and milieu therapy and worked on coping skills.  (*Id.*)  Her mood

remained depressed and anxious, her judgment and insight remained limited, and she continued to hear voices, although they lessened in intensity.  (*Id.*)

At an initial attempted discharge on July 6, 2018, Ms. Draine reported she did not feel she could keep herself safe after discharge and that she would likely attempt suicide by overdose if she were discharged.  (*Id.*)  On July 7, 2018, she experienced side effects while on Geodon and asked to discontinue it.  (*Id.*)  A recommendation was made to attempt another antipsychotic, such as Abilify, since she did not tolerate the Geodon.  (*Id.*)  After an attempt to start Ms. Draine on Abilify, she became very tearful and said she wanted to die, and felt she was a burden.  (*Id.*)

By July 9, 2018, Ms. Draine reported feeling better, no longer having suicidal or homicidal thoughts, being ready for discharge, and feeling that she could keep herself safe.  (*Id.*)  At the time of her discharge, her mood and affect had improved and were fair, her speech was normal, she denied suicidal ideation and hallucinations, and her judgement and insight "[h]ad gradually improved."  (Tr. 442.)  She was discharged in improved condition and continued on Prozac 20 mg daily and melatonin 6 mg at bedtime.  (Tr. 442, 444.)

Ms. Draine attended a therapy session with LISW Cunningham on July 16, 2018.  (Tr. 895.)  She reported her release from Laurelwood hospital and said she was feeling better.  (*Id.*)  She had seen a new neurologist for headaches, believed to be stress migraines.  (*Id.*)  On examination, she had no suicidal ideation or intent.  (*Id.*)  She reported being off Lamictal and back on Prozac.  (*Id.*)  LISW Cunningham indicated she was improved.  (*Id.*)

Ms. Draine did not return to therapy until August 13, 2018, when she reported an increase in anxiety and panic, and that she was having increased physical pain from PCOS and migraines.  (Tr. 894.)  She reported feeling very overwhelmed, having agoraphobic thinking, and not wanting to leave the house due to panic.  (*Id.*)  She also reported struggling with learning to drive

and said she did not think she would be able to do it.  (*Id.*)  She said she was too unstable and incapable of going to school or working, and was very upset that she was disappointing people; LISW Cunningham and Ms. Draine's mother gave her permission not to attend school or get a job, and told her they were not disappointed in her.  (*Id.*)  LISW Cunningham opined that Ms. Draine was not capable of functioning in those environments.  (*Id.*)

On August 16, 2018, Ms. Draine met with Kyra Pacer, APRN-CNS, to establish care with an adult provider for medication management.  (Tr. 632-35.)  Ms. Draine reported seeing LISW Cunningham regularly for therapy, which she found helpful.  (Tr. 632.)  She explained that her Laurelwood admission in July 2018 was because she was having suicidal thoughts and was overwhelmed with everything, like not going to college and learning to drive.  (*Id.*)  She said she was no longer having suicidal thoughts and was tolerating the Prozac prescribed at Laurelwood, but continued to have high anxiety and low motivation.  (*Id.*)  CNS Pacer diagnosed: depression, recurrent; anxiety; insomnia, persistent; and borderline personality disorder.  (Tr. 634.)  She increased Ms. Draine's Prozac prescription to 30 mg daily.  (*Id.*)

Ms. Draine attended therapy sessions with LISW Cunningham on August 27 and September 10 and 24, 2018.  (Tr. 891-93.)  Minimal suicidal ideation with no intent and protective factors were noted on September 10, but she demonstrated no suicidal ideation or intent at the other two sessions.  (*Id.*)  She reported family and relationship issues and struggles with physical pain, possibly fibromyalgia.  (*Id.*)  LISW opined that she was stable.  (*Id.*)

Ms. Draine returned to CNS Pacer for medication management on October 4, 2018.  (Tr. 628-31.)  She reported a continued depressed mood and low motivation, as well as loneliness, but no self-harm behaviors.  (Tr. 628.)  CNS Pacer noted Ms. Draine needed to work on regulating her sleep wake pattern.  (*Id.*)  She diagnosed: depression, recurrent; anxiety; and

insomnia, persistent.  (Tr. 630.)  CNS Pacer renewed Prozac at the same dosage and added a prescription for bupropion xl.  (Tr. 628, 630.)

Ms. Draine attended therapy sessions with LISW Cunningham on October 29, and November 12 and 26, 2018.  (Tr. 888-90.)  She demonstrated suicidal ideation with no intent and protective factors present on November 12, but no suicidal ideation or plan at the other sessions. (*Id.*)  She continued to complain of relationship issues, physical pain, and migraines.  (*Id.*) LISW Cunningham continued to opine that her condition was stable.  (*Id.*)  On October 29, Ms. Draine reported that CNS Pacer had started her on Wellbutrin; her mother thought it had been helpful, and Ms. Draine reported that she was "lighter and doing more activities."  (Tr. 890.)  She still did not feel emotionally capable of functioning in the work or school world.  (*Id.*)  On November 26, LISW Cunningham again suggested EMDR as a treatment option.  (Tr. 888.)

Ms. Draine returned to medication management with CNS Pacer on November 29, 2018. (Tr. 624-27.)  She reported a continued depressed mood, but was taking her medications as prescribed; she reported no self-harm behaviors and no suicidal thoughts.  (Tr. 624.)  She also reported issues with migraine headaches, which were managed with amitriptyline by another provider.  (*Id.*)  CNS Pacer continued Ms. Draine on bupropion and Prozac.  (Tr. 626-27.)

Ms. Draine attended additional therapy sessions with LISW Cunningham on December 10, 2018, and January 14, 2019.  (Tr. 886-87.)  On December 10, she reported no suicidal ideation or intent, but said she was more depressed with the increase in Wellbutrin.  (Tr. 887.) She also complained of migraines, worse even with amitriptyline, and physical pain in her back and legs.  (*Id.*)  Her condition was stable.  (*Id.*)  On January 14, she complained of suicidal ideation with no plan, and indicated her sense of hopelessness was higher.  (Tr. 886.)  She complained of brain fog, not enjoying anything anymore, nightmares, and chronic pain.  (*Id.*)

She reported that her headaches seemed to be related to Prozac.  (*Id.*)  LISW Cunningham

observed that Ms. Draine was "struggling in many areas."  (*Id.*)

On January 24, 2019, Ms. Draine attended a medication follow up appointment with CNS

Pacer.  (Tr. 620-23.)  She reported that she was diagnosed with tension headaches in November

2018, and that the headaches had become less intense since she stopped Prozac a week before.

(Tr. 620.)  She also reported being less emotional, crying less, and being less depressed, ranking

her depression as 7/10 to 8/10 and her anxiety 6/10 to 7/10, with the anxiety the same as when

she was on Prozac.  (*Id.*)  Ms. Draine also reported: chronic pain; panic attacks, although not as

bad as when she was in school; and suicidal thoughts, with no intention to act on them.  (*Id.*)

CNS Pacer continued Ms. Draine on bupropion 150 mg.  (Tr. 622.)

Ms. Draine attended therapy sessions with LISW Cunningham on January 28 and

February 11 and 25, 2019.  (Tr. 877-85.)  She continued to report no suicidal ideation or intent.

(*Id.*)  On January 28, she complained of lack of restorative sleep and ongoing pain, but less

headaches.  (Tr. 885.)  LISW Cunningham reviewed the EMDR plan and began the trauma

narrative.  (*Id.*)  She noted Ms. Draine was struggling with sleep and pain.  (*Id.*)  At the other two

sessions, LISW Cunningham noted Ms. Draine's condition was stable.  (Tr. 879, 882.)  On

February 11, Ms. Draine reported increased depression and continued migraines, less frequent

than when she was on Prozac; EMDR was postponed so LISW Cunningham could address issues

raised by Ms. Draine and her mother.  (Tr. 882.)  On February 25, Ms. Draine reported that her

mood was more labile and angry, and that she had physical symptoms since starting Cymbalta.

(Tr. 879.)  She rejected resourcing techniques to prepare for EMDR, stating they did not work

for her because her hope was so low and her feelings of worthlessness were so high.  (*Id.*)

At a March 7, 2019 medication follow-up visit with CNS Pacer, Ms. Draine reported a depressed mood and spending a lot of time in bed, but had no thoughts of self-harm. (Tr. 595.) CNS Pacer increased her duloxetine dosage to 30 mg twice daily and renewed her bupropion 150 mg. (Tr. 595, 597-98.) Ms. Draine returned to therapy with LISW Cunningham on March 25, 2019, reporting no suicidal ideation or intent; her condition was stable. (Tr. 876.) She continued to complain of chronic pain and remained resistant to EMDR. (*Id.*)

At a therapy session on April 22, 2019, Ms. Draine reported that she wanted to be dead and admitted attempting suicide one week prior by taking some of her old Prozac. (Tr. 875.) She complained of family and housing issues and was not taking her medications. (*Id.*) Her mother explained that she was denied for disability benefits and they were appealing. (*Id.*) LISW Cunningham explained that Ms. Draine needed to be hospitalized and contacted Highland Springs for an intake. (*Id.*) LISW Cunningham also supported Ms. Draine not returning home after her hospitalization, and referred her to an independent living program at Bellfaire. (*Id.*)

Ms. Draine was admitted to Highland Springs Hospital for depression and suicidal ideations on April 22, 2019. (Tr. 482-85.) It was determined that Ms. Draine needed inpatient care to stabilize a worsening severity of major depressive disorder and suicidal ideation with a recent attempt of overdose. (Tr. 484.) Ms. Draine reported feeling suicidal for the past three weeks, with a suicide attempt three weeks prior by overdosing on unknown sleep medications. (Tr. 482.) She also reported not taking her psychiatric medications for the past three weeks. (*Id.*) Reported symptoms included depressed mood, current suicidal ideation with no particular plan, decreased interest, decreased motivation, decreased energy, excessive worry, difficulty concentrating, and increased irritability. (*Id.*) On examination, Ms. Draine exhibited a depressed mood and restricted affect, slow and soft speech, linear and logical thought process, and intact

associations; she was oriented, and denied any auditory or visual hallucinations; her judgment was poor and her insight was fair. (Tr. 483-84.) She was discharged home with her mother on April 26, 2019, with a plan to get medications and attend after care appointments. (Tr. 507.)

At a therapy session with LISW Cunningham on May 6, 2019, Ms. Draine reported that her medications were changed to Pristique and Seroquel, and that she was feeling much better on these medications. (Tr. 874.) LISW Cunningham suggested Ms. Draine attend a NAMI support group, and recommended she continue with weekly psychotherapy. (*Id.*) On examination, Ms. Draine continued to have ongoing passive suicidal ideation with no intent, with protective factors present. (*Id.*) She appeared improved from the last visit. (*Id.*)

At a medication follow up with CNS Pacer on May 9, 2019, Ms. Draine reported her mood was less depressed since her five-day hospitalization for depression and a suicide attempt. (Tr. 591.) She had no thoughts of self-harm. (*Id.*) CNS Pacer prescribed Pristiq 50mg and Seroquel 25mg. (Tr. 593-94.)

Ms. Draine returned to therapy on May 20, 2019. (Tr. 873.) She reported happiness about a new relationship and enrolling in a summer job training program. (*Id.*) She was managing living at home better and reported that her medications were working for her. (*Id.*) LISW Cunningham noted no current suicidal ideation, but indicated that it waxed and waned. (*Id.*) She opined that Ms. Draine's condition was stable. (*Id.*)

Ms. Draine attended additional therapy sessions with LISW Cunningham on June 3 and 24, 2019. (Tr. 871-72.) LISW Cunningham noted no suicidal ideation or intent and indicated Ms. Draine was stable. (*Id.*) On June 3, she reported her Pristique was helping, and questioned whether an increased dosage could help. (Tr. 872.) She reported difficulty attending a Memorial

Day Party.  (*Id.*)  On June 24, she reported family and relationship issues and ongoing physical symptoms, but also reported doing well and having minimal depression.  (Tr. 871.)

At Ms. Draine's next therapy visit, on August 26, 2019, she reported Seroquel was helpful with her mood and sleep issues, and that she had completed a vocational program and enjoyed working in a café.  (Tr. 870.)  LISW Cunningham noted suicidal ideation with no intent and protective factors present, but that Ms. Draine was "[m]uch less suicidal than in the past," and that her condition was stable.  (*Id.*)

Ms. Draine attended a medication follow up with CNS Pacer on August 29, 2019.  (Tr. 587-90.)  She complained of a depressed mood but reported that she liked Pristiq better than duloxetine.  (Tr. 587.)  She reported no thoughts of self-harm and a more regular sleep pattern. (*Id.*)  CNS Pacer increased Ms. Draine's Pristiq dosage to 100mg and renewed her Seroquel prescription.  (Tr. 590.)

Ms. Draine attended further therapy appointments with LISW Cunningham on September 23 and October 28, 2019.  (Tr. 868-69.)  She demonstrated no suicidal ideation or intent, and her condition was stable.  (*Id.*)  On September 23, Ms. Draine reported babysitting for a girl in the neighborhood who had difficult behaviors, which was positive for her.  (Tr. 869.)  She also reported a two-week slump of depression and fibromyalgia pain, and that it was possible the Gabapentin used to treat her migraines was making her tired.  (*Id.*)  On October 28, LISW Cunningham indicated Ms. Draine was functioning the best she had ever seen her.  (Tr. 868.) She continued to babysit for a difficult teenager; she was managing it well, and it seemed to be helping her to mature.  (*Id.*)  Ms. Draine reported ongoing physical issues, but that she was able to push through the pain.  (*Id.*)  She was actively using coping skills such as boundary setting, self-care, reframing, and examining the effectiveness of circumstances.  (*Id.*)

14

On December 5, 2019, Ms. Draine met with CNS Pacer for medication management. (Tr. 583-86.)  She reported that she had been more depressed lately but not as much as before taking Pristiq and Seroquel.  (Tr. 583.)  She agreed to an increase in her Seroquel dosage.  (*Id.*)  Ms. Draine reported that she had been sleeping too much due to depression and had difficulty motivating herself for activities of daily living, but had no thoughts of self-harm.  (*Id.*)  CNS Pacer renewed her Pristiq prescription and increased her Seroquel prescription.  (*Id.*)

At her next therapy session, on January 6, 2020, Ms. Draine reported an increase in depression and "weird dreams" after the increase in Seroquel.  (Tr. 867.)  She was no longer babysitting and complained: "Everything is happening too fast and I'm not ready for it."  (*Id.*)  She did not express any suicidal ideation or intent, and her condition was stable.  (*Id.*)

At a medication follow up appointment with CNS Pacer on January 30, 2020, Ms. Draine reported more depression, mood swings, racing thoughts, headaches, and losing track of time.  (Tr. 579.)  She did not have thoughts of self-harm or self-harm behaviors.  (*Id.*)  She reported being too tired on Seroquel and agreed to switch to Geodon.  (*Id.*)  CNS Pacer renewed her Pristiq prescription and started her on Geodon 20 mg.  (Tr. 582.)

Ms. Draine returned to therapy with LISW Cunningham on February 17, 2020.  (Tr. 866.)  She complained of daily migraines, which she attributed to her Geodon prescription.  (*Id.*)  Her examination noted suicidal ideation with no intent and protective factors present; she complained of daily suicidal thoughts, but said she was able to stop them by thinking about her family.  (*Id.*)  She also reported daily fibromyalgia pain, feeling irritable and numb, and not sleeping well because she was dependent on Seroquel for sleep.  (*Id.*)  Her condition was stable.  (*Id.*)

Ms. Draine next attended telehealth appointments with LISW Cunningham on April 27 and May 18, 2020.  (Tr. 908-11.)  She continued to report no suicidal ideation or intent, and her

condition remained stable.  (*Id.*)  On April 27, she complained of ongoing headaches and migraines and issues with sleep.  (Tr. 908.)  She was worried about COVID-19 and its possible effects.  (*Id.*)  On May 18, she was obsessing about the pandemic and catastrophizing about its uncertainty.  (Tr. 910.)  She complained of an increase in depression.  (*Id.*)

Ms. Draine attended another telehealth appointment with LISW Cunningham on June 30, 2020.  (Tr. 912-13.)  She reported having a difficult month because her birthday and Father's Day were both triggers for her.  (Tr. 912.)  She reported suicidal ideation with no intent; protective factors were present and she said she would not act on those thoughts because of how it would affect her family.  (*Id.*)  LISW Cunningham worked with Ms. Draine on being comfortable with her decisions not to learn to drive and not to attend college.  (Tr. 912-13.)  She was open to working, but could not find anything and had not received responses to her inquiries.  (Tr. 913.)  LISW Cunningham indicated that her condition remained stable.  (*Id.*)

Ms. Draine attended further therapy sessions with LISW Cunningham via telehealth on September 16, October 7, November 11, 2020.  (Tr. 914-919.)  On September 16, she reported ongoing depression, fed by concerns about COVID, but no suicidal ideation or intent; her condition was stable.  (Tr. 916-17.)  On October 7, she reported ongoing severe depression with some passive suicidal thoughts; protective factors were present and her condition remained stable.  (Tr. 914.)  LISW Cunningham noted that her suicidal thoughts seemed rooted in the pressure she felt from others to get a job, which would also require her to drive.  (*Id.*)  She reported trying to get a job with no success.  (*Id.*)  On November 11, she reported suicidal ideation with no intent, triggered and made worse by the election, but was using DBT skills to control and decrease suicidal thoughts; her condition remained stable.  (Tr. 918-19.)  She

continued to look for jobs with no success, which was frustrating.  (Tr. 919.)  At several sessions, she continued to report migraine and tension headaches and/or fibromyalgia.  (Tr. 916, 919.)

Ms. Draine attended a medication management session with CNS Pacer via telehealth on November 30, 2020.  (Tr. 972-77.)  She complained of sleeping too much, low energy and motivation, and passive suicidal thoughts "a few times," but no mood cycling and no thoughts of self-harm or self-harm behaviors.  (Tr. 973.)  She reported Pristiq worked better than other antidepressants.  (*Id.*)  She attended therapy that month and felt it helped with her coping skills. (*Id.*)  When she had suicidal thoughts, she usually tried to distract herself; she enjoyed baking. (*Id.*)  She also complained of daily headaches, treated with rizatriptan prn and Aimovig injections; CNS Pacer discussed the potential for serotonin syndrome and the symptoms involved.  (*Id.*)  CNS Pacer prescribed Trazodone for sleep and renewed Pristiq.  (Tr. 977.)

Ms. Draine returned to therapy with LISW Cunningham via telehealth on January 12, 2021, reporting that she was struggling with the pandemic and events in the country.  (Tr. 922.) She continued to look for work, which was "miserable," and felt pressured to work.  (*Id.*)  She also reported suicidal ideation with no intent, with protective factors, saying she never thought she could live this long and felt she shouldn't be living.  (Tr. 921.)  LISW Cunningham observed she was steeped in her suicidal thinking and did not have the energy to work on changing it.  (Tr. 922.)  LISW Cunningham indicated hospitalization had not been helpful in the past and only traumatized Ms. Draine, who agreed to use coping skills to move through the situation.  (*Id.*)

Ms. Draine attended another medication management session with CNS Pacer on January 18, 2021.  (Tr. 966-71.)  She continued to complain of daily headaches, with a plan to follow up with neurology.  (Tr. 967.)  She also complained of low motivation and energy, having to push herself to complete activities of daily living, and passive thoughts that it would be better not to

17

be here.  (*Id.*)  She was ruminating, but said it was less.  (*Id.*)  CNS Pacer continued Ms. Draine's medications.  (Tr. 970-71.)

### 2.  Opinion Evidence

#### i.  Consultative Examinations

Consultative Psychological Examination

Ms. Draine attended a consultative psychological examination with Ranada Cooper, Psy.D., on December 1, 2018.  (Tr. 459-64.)  She reported she could not function like a normal person, was in constant pain, had bad crying spells, was always depressed, and had a bad mood that others didn't want to be around.  (Tr. 459.)  She reported past diagnoses of major depressive disorder, generalized anxiety disorder, social phobia, panic disorder, seasonal affective disorder, PTSD, and borderline personality disorder, with multiple psychiatric hospitalizations, including her most recent hospitalization in July 2018 at Windsor-Laurelwood.  (Tr. 461.)  Ms. Draine said she needed reminders to complete her activities of daily living and was not able to manage her finances.  (Tr. 462.)  On examination, she was oriented and able to respond to questions appropriately, had perfect immediate, short-term, and long-term recall, and was able to perform 3-stage commands without error.  (Tr. 463.)  She had appropriate insight and judgment and was cooperative.  (*Id.*)  Dr. Cooper diagnosed major depressive disorder, recurrent, with psychotic features, and unspecified anxiety disorder; Ms. Draine's prognosis was poor.  (Tr. 464.)

As to Ms. Draine's ability to understand, carry out, and remember simple and complex instructions, Dr. Cooper opined that Ms. Draine could understand and remember, but that "her depressive symptoms might hinder or negatively impact her ability to carry out instructions in a work setting."  (*Id.*)  As to her ability to sustain concentration and persist in a work setting, Dr. Cooper opined that Ms. Draine could maintain concentration but that "her persistence in a work

setting might negatively be hindered by her depressive symptoms with psychotic features." (*Id.*) As to her social interaction abilities, Dr. Cooper opined that Ms. Draine "ha[d] inadequate social skills and c[ould ]not interact appropriately in a work setting due to her current symptoms of depression." (*Id.*) As to her ability to deal with normal pressures in a competitive work setting, Dr. Cooper opined that Ms. Draine might "have an inability to handle pressure in a work setting due to her symptoms of depression that negatively impact her ability to leave the home." (*Id.*) Dr. Cooper opined that Ms. Draine could not effectively or independently manage funds. (*Id.*)

Consultative Medical Examination

On February 9, 2019, Ms. Draine presented to Ashley Fuentes, D.O., for a physical consultative examination. (Tr. 467-69.) Ms. Draine complained of pain in her back, legs, shoulders, and arms which started a year prior and became progressively worse. (Tr. 467.) She reported that her doctor believed she might have fibromyalgia. (*Id.*) On examination, Ms. Draine had no limitations in her passive range of motion or strength, no significant pain with palpation, and her straight leg raise was negative bilaterally; her gait was normal. (Tr 468.) Reflexes were 1+ in bilateral upper and lower extremities. (*Id.*) Lumbar imaging disclosed normal bony alignment with no acute fracture or dislocations. (Tr. 469.) Dr. Fuentes diagnosed Ms. Draine with chronic pain, PCOS, migraines, and mental health issues. (*Id.*) Dr. Fuentes opined that Ms. Draine did not appear to have any limitations with standing, walking, lifting, carrying, handling, traveling, speaking, memory, sitting, or hearing. (*Id.*)

**ii.       State Agency Reviewers**

At the initial level on February 25, 2019, state agency psychological consultant Mary Hill, Ph.D., opined that Ms. Draine had mild limitations in understanding, remembering, or applying information and moderate limitations in interacting with others, concentrating,

persisting, or maintaining pace, and adapting and managing oneself.  (Tr. 83.)  She further

opined that Ms. Draine had the following limitations in mental functioning: she could perform 1-

3 step short cycle tasks; she could not perform customer service duties, or duties involving

conflict resolution or persuading others; her interactions with others needed to be on a superficial

level; she could work in a static environment where change was explained and gradually

introduced.  (Tr. 86-87.)

At reconsideration on June 13, 2019, state agency psychological consultant Irma

Johnston, Psy.D., agreed with Dr. Hill's assessment.  (Tr. 103-04, 106-08.)

At the initial level on February 26, 2019, state agency medical consultant Uma Gupta,

M.D., opined that Ms. Draine had no severe physical impairments.  (Tr. 78-79.)

At reconsideration on June 15, 2019, state agency medical consultant Louis Goorey,

M.D., agreed with Dr. Gupta's assessment.  (Tr. 99-100.)

### iii.    Treating Providers

<u>Kelly Cunningham, LISW</u>

On February 26, 2021, LISW Cunningham completed a Mental Impairment

Questionnaire.  (Tr. 960-61.)  She reported treating Ms. Draine bimonthly for borderline

personality disorder and major depressive disorder.  (Tr. 960.)  She noted that Ms. Draine was

taking Desvenlafaxine ER 50 mg, Rizatriptan, and Trazodone, with fatigue as a side effect.  (*Id.*)

When asked to describe the clinical findings demonstrating the severity of Ms. Draine's mental

impairment and symptoms, LISW Cunningham wrote: "Severe."  (*Id.*)  She indicated that Ms.

Draine's prognosis was "poor."  (*Id.*)

LISW Cunningham then completed a checkbox form to provide her opinion "based on

[her] examination" as to how Ms. Draine's mental and emotional capabilities were affected by

her impairments, using the designations: unlimited or very good; limited but satisfactory; seriously limited but not precluded; unable to meet competitive standards; and no useful ability to function.  (Tr. 960-61.)  LISW Cunningham checked boxes indicating Ms. Draine had a *limited but satisfactory* ability to carry out very short and simple instructions and be aware of normal hazards and take appropriate precautions and was *unable to meet competitive standards* with respect to all understanding and memory activities.  (*Id.*)  In every other category of limitation—including sustained concentration and persistence, social interaction, and adaptation—LISW Cunningham opined that Ms. Draine had *no useful ability to function*.  (*Id.*)  LISW Cunningham also opined that Ms. Draine would miss one to two days of work per week and would be off task for two to four hours per day.  (Tr. 961.)

<u>Kyra Pacer, APRN-CNS</u>

On March 17, 2021, CNS Pacer completed a mental impairment questionnaire.  (Tr. 963-65.)  She reported treating Ms. Draine every one to three months for medication management since August 2018.  (Tr. 963.)  Diagnoses included: depression recurrent; anxiety; borderline personality disorder; and insomnia.  (*Id.*)  Medications included densvenlafaxine er 50 mg, 3 tablets daily, and trazodone 50 mg at bedtime; there were no medication side effects.  (*Id.*)  When asked to describe clinical findings demonstrating the severity of Ms. Draine's mental impairments and symptoms, CNS Pacer indicated she often appeared at appointments with a depressed affect and nonverbal cues of anxiety, and sometimes did not follow thorough in making medical appointments.  (*Id.*)  Ms. Draine's prognosis was reportedly "undetermined," but: her mental health condition had a moderate to severe impact on her activities; the condition was chronic; and she had much difficulty with past medication trials with ineffective responses and side effects in the context of existing medical issues, including chronic headaches.  (*Id.*)

21

CNS Pacer then completed a checkbox form to provide her opinion "based on [her] examination" as to how Ms. Draine's mental and emotional capabilities were affected by her impairments, using the designations: unlimited or very good; limited but satisfactory; seriously limited but not precluded; unable to meet competitive standards; and no useful ability to function.  (Tr. 963-65.)  As to sustained concentration and persistence limitations, CNS Pacer opined that Ms. Drain was *unlimited or very good* in carrying out very short and simple instructions, *limited but satisfactory* at performing activities within a schedule, sustaining an ordinary routine without special supervision, and working in coordination or proximity to others without being distracted by them; but she opined that Ms. Drain was *seriously limited, but not precluded* with respect to all other activities in this category.  (Tr. 963-64.)  With respect to understanding and memory, adaptation, and social interaction limitations, CNS Pacer opined that Ms. Drain was *unlimited or very good* or *limited but satisfactory* in all activities.  (Tr. 964.)

CNS Pacer indicated that it was "unknown" how often Ms. Draine's impairments or treatments would cause her to be absent from work, but said she could miss work several days a month if she had exacerbation of her anxiety and depression, and that it "would be very difficult to work full time schedule due to mental health condition."  (Tr. 964.)  CNS Pacer was unable to determine how often Ms. Draine's symptoms would cause her to be off task.  (Tr. 964-65.)

### 3.    Hearing Testimony

#### i.    Plaintiff's Testimony

April 15, 2020 Hearing

At her telephonic hearing on April 15, 2020, Ms. Draine testified that she was disabled because of chronic migraines, fibromyalgia, polycystic ovarian syndrome, depression, anxiety, borderline personality disorder and post-traumatic stress disorder ("PTSD").  (Tr. 56.)  At the

time of the hearing, she had a headache and back pain that she rated at about 6/10.  (Tr. 57.)  She complained of daily pain at 6/10, 7/10, or higher, which made it hard to be out of bed, hard to stand, and hard to be outside because of how bright it was.  (Tr. 58.)  She said her fibromyalgia wore her down if she worked more than four or five hours, causing a flare of pain.  (*Id.*)

Ms. Draine also explained that it was more her mental health issues that interrupted her ability to work, including depression and suicidal ideations.  (Tr. 58-59.)  She reported struggling to find purpose with the things in her life, and said she was hospitalized many times due to those problems.  (Tr. 59.)  Her most recent hospitalization was in April 2019.  (*Id.*)  She testified that she had been seeing a therapist on and off for ten years, and saw a psychiatrist.  (*Id.*)  She reported being unable to get into programs for her mental health without completely changing her providers, and said she did not want to leave them.  (Tr. 59-60.)  She had to drop her therapist to do DBT therapy, and then had to wait to see her therapist again.  (Tr. 60.)

With respect to mental health symptoms, she reported hallucinating during a bad depressive episode in 2018, with no hallucinations since then.  (Tr. 61-62.)  She also reported destructive episodes due to her borderline personality disorder every couple of months.  (Tr. 62.)  She testified that she struggled most days to find things to do around the house to stop herself from spiraling into depressive episodes.  (Tr. 62-63.)

April 6, 2021 Hearing

At her second telephonic hearing, on April 6, 2021, Ms. Draine testified that she struggled every day to get out of bed and do basic tasks because of her depression.  (Tr. 38.)  Over the last year, she had many days where she felt as if suicide were the only answer to dealing with the things that were going on in her head.  (*Id.*)  She testified that her depression was so heavy she didn't see the point of getting out of bed or continuing to live.  (*Id.*)

She testified that she was working with BVR Opportunities for Ohioans with Disabilities, where she received training on applying for jobs and how to conduct herself at interviews. (*Id.*) She said she tried not to be a burden on her mother, but had to rely on her for financial support. (*Id.*) Through BVR, she got a job at Burlington Coat Factory, where she had been working about twenty hours per week for a month. (Tr. 38-39.) She worked as a cashier, on the floor, or as a greeter. (Tr. 39.) She did not believe she would be able to sustain working there much longer, explaining she had been scheduled for overtime the week prior, had a breakdown, and was again contemplating a relapse or suicide. (*Id.*) She had missed two days of work that month due to her mental health symptoms. (*Id.*) Some days she felt so overwhelmed, she had to step away from her shift at the register to cry in the bathroom for ten or fifteen minutes. (Tr. 40.) Ms. Draine believed she would have to hospitalize herself from the stress if she worked full time. (Tr. 42.) Even working part time, she said she was struggling every single day not to kill herself. (*Id.*)

Ms. Draine treated her mental health symptoms with medication management and therapy. (Tr. 40.) She tried to get in to see her therapist every two weeks, but had difficulty obtaining appointments because her therapist was often booked. (*Id.*) Over the past month, she reported an increase in her sleeping medication, but said her other medications remained the same. (*Id.*) She had not been hospitalized in the last year, but said that was due to an inability to afford it; she was still paying for her last hospitalization in 2019. (*Id.*) Ms. Draine also testified she had had five suicide attempts in the past two years. (Tr. 43.) Her last attempt was by drug overdose around her birthday, ten months earlier. (*Id.*)

Ms. Draine also testified to having pain and fatigue that affected her ability to work, which had increased since she started working. (*Id.*) Some weeks she was scheduled three days in a row, and returned home exhausted and in pain. (*Id.*) She would wake up in pain from

24

fibromyalgia.  (*Id.*)  She testified that her general practitioner did not want to give her a fibromyalgia diagnosis because she was only twenty years old, and her doctor believed it would affect the quality of treatment she might receive from other providers.  (*Id.*)  She rated her fibromyalgia pain during the hearing at 7/10.  (Tr. 43.)  She treated her pain with NSAIDs, but did not find them effective.  (*Id.*)

### ii.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing on April 15, 2020.  (Tr. 63-67.)  He testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the RFC determination, could perform representative positions in the national economy, including cleaner II, linen room attendant, or housekeeper/cleaner.  (Tr. 64-65.)  If the person would be absent two days a month on an ongoing basis, the VE testified that would preclude competitive employment.  (Tr. 66.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his July 6, 2021 decision, the ALJ made the following findings:[1]

1. 1. The claimant was born in June 2000. Therefore, she was an adolescent on April 18, 2018, the date application was filed.  The claimant attained age 18 in June 2018.  (Tr. 17.)

---

[1] The ALJ's findings are summarized.

2.      The claimant has not engaged in substantial gainful activity since April 18, 2018, the application date.  (*Id.*)

3.      Before attaining age 18, the claimant had the following severe impairments: depression, anxiety, and borderline personality disorder. (*Id.*)

4.      Before attaining age 18, the claimant [did] not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 19.)

5.      Before attaining age 18, the claimant did not have an impairment or combination of impairments that functionally equaled the listings.  (*Id.*)

6.      Because the claimant did not have an impairment or combination of impairments that met, medically equaled any listing or functionally equaled the listings, the claimant was not disabled prior to attaining age 18.  (Tr. 21.)

7.      The claimant has not developed any new impairment or impairments since attaining age 18.  (*Id.*)

8.      Since attaining age 18, the claimant has continued to have a severe impairment or combination of impairments.  (*Id.*)

9.      Since attaining age 18, the claimant has not had an impairment or combination of impairments that meets or medically equals a listed impairment.  (*Id.*)

10.     Since attaining age 18, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is precluded from exposure to high concentrations of dust, fumes, and smoke. The claimant is limited to simple, repetitive tasks, with no high production quotas or production pace work. The claimant is limited to superficial and occasional interaction with the public and with peers, meaning no negotiation, arbitration, supervision, or commercial driving.  (Tr. 22.)

11.     The claimant has no past relevant work.  (Tr. 26.)

12.     The claimant is currently a "younger individual age 18-44."  (*Id.*)

13.     The claimant has at least a high school education.  (*Id.*)

14.     Transferability of job skills is not material to the determination of disability.  (*Id*.)

15.     Since attaining age 18, and considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner II, linen room attendant, and housekeeper/cleaner.  (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the time she turned age 18 in June 2018, through the date of the decision on July 6, 2021.  (Tr. 27.)

## V.     Plaintiff's Arguments

Ms. Draine presents the following arguments for this Court's review:

1.     The ALJ erred when he failed to find that Ms. Draine's fibromyalgia and/or migraines were severe impairments at Step Two of the Sequential Evaluation.

2.     The ALJ erroneously failed to follow the Appeals Council Order of Remand.

3.     The ALJ erred when he failed to find that the opinions of the treating sources were consistent with and supported by the medical evidence and failed to incorporate the stated limitations into his RFC.

(ECF Doc. 8, pp. 1, 9, 12, 17.)

## VI.     Law & Analysis

### A.     Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

28

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

29

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**   **First Assignment of Error: Whether ALJ Erred in Failing to Find Fibromyalgia and Migraine Headaches Were Severe Impairments**

In her first assignment of error, Ms. Draine argues that the ALJ erred when he failed to find at Step Two of the sequential evaluation that fibromyalgia and migraine headaches were "severe" impairments.  (ECF Doc. 8, pp. 9-12.)  Each argument will be addressed in turn.

**1.**   **Whether ALJ Erred in Finding Fibromyalgia Not Medically Determinable**

After noting that the ALJ did not find fibromyalgia to be a severe impairment at Step Two of the sequential analysis, Ms. Draine argues summarily: "Failing to consider [Ms.] Draine's pain, whether or not it was related to a diagnosis of fibromyalgia, was in error necessitating a remand of this matter."  (ECF Doc. 8, pp. 10-11.)  But she acknowledges that the ALJ found she "did not satisfy the criteria for a diagnosis of fibromyalgia as there w[as] no tender point testing, nor a three month history of generalized pain, and no evidence that other disorders had been excluded."  (*Id.* at p. 10 (citing Tr. 18).)  The Commissioner responds that the ALJ did not err in finding fibromyalgia was not medically determinable under Social Security Ruling ("SSR") 12-2p, which provides that a fibromyalgia diagnosis alone is insufficient to support a finding that it is a medically determinable impairment.  (ECF Doc. 9 at pp. 11-12.)

SSR 12-2p provides guidance on how an ALJ should "develop evidence to establish that a person has a medically determinable impairment of fibromyalgia," and "evaluate fibromyalgia" in the context of a disability claim.  *See* SSR 12-2p, 77 Fed. Reg. 43640-44 (Jul. 25, 2012).  SSR 12-2p explains that there are two methods for determining whether an individual has a medically determinable impairment of fibromyalgia.  (*Id.* at 43641.)  Each method requires a showing a widespread pain and evidence that other disorders that could cause the signs or symptoms have

been excluded.  (*Id.*)  One method looks to the existence of tender points and the other looks to

"[r]epeated manifestations of six or more FM symptoms, signs, or co-occurring conditions,

especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking

unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  (*Id.* (footnotes

omitted).)

      In this case, the ALJ acknowledged the diagnostic standards in SSR 12-2p and concluded

fibromyalgia was not medically determinable under that standard, explaining:

> Treatment notes indicate that the claimant complained of tiredness and fogginess
> [], and was diagnosed with fibromyalgia [].  While the claimant has a diagnosis of
> fibromyalgia from an acceptable medical source, there must be appropriate clinical
> signs or laboratory findings to support that diagnosis. . . . In this case, no doctor
> documented tender points, and did not discuss specific symptoms. There are no
> such tests in the file. There is no evidence that other disorders were excluded. Based
> on those factors, the claimant's fibromyalgia is not medically determined.

(Tr. 18 (citations omitted).)  Ms. Draine acknowledges these findings in her brief, but argues

without further explanation that the ALJ erred by "[f]ailing to consider [Ms.] Draine's pain." [2]

(ECF Doc. 8, pp. 10-11.)  Thus, she does not offer any argument to support a conclusion that the

ALJ did not adequately explain his Step Two findings regarding fibromyalgia, or lacked the

support of substantial evidence.  The Court's own review of the record does not fill in this gap.

      For the reasons set forth above, the Court finds Ms. Draine has failed to prove that the

ALJ erred in finding fibromyalgia was not medically determinable at Step Two.  Ms. Draine's

conclusory argument to the contrary is without merit.

---

[2] To the extent Ms. Draine intended to argue the ALJ erred in considering her subjective complaints, the argument
was not clearly articulated or adequately developed and is deemed waived.  *See Hollon ex rel. Hollon v. Comm'r of
Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006); *see also McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).

2. **Whether ALJ Erred in Finding Migraine Headaches Nonsevere**

Ms. Draine next argues that the ALJ erred in finding her migraine headaches to be nonsevere at Step Two, asserting that this finding was contrary to SSR 19-4p and that "the record established the headaches and their frequency."[3]  (ECF Doc. 8, pp. 11-2.)  The Commissioner argues in response that it is "legally irrelevant" whether the ALJ found migraines to be nonsevere because the ALJ found other impairments to be severe and went on to assess Ms. Draine's RFC.  (ECF Doc. 9, pp. 12-13.)

i. **Analysis for Step Two Severity Determinations**

A claimant bears the burden of showing the severity of her impairments.  *Foster v. Sec'y of Health & Hum. Servs.,* 899 F.2d 1221, at *2 (6th Cir. 1990) (unpublished table decision) (citing *Murphy v. Sec'y of Health & Human Svcs.*, 801 F.2d 182, 185 (6th Cir. 1986)).  A "severe" impairment is defined under the regulations as "any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities."  *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520(c)); *see also Long v. Apfel*, 1 F. App'x 326, 330–32 (6th Cir. 2001).

The Sixth Circuit has construed Step Two as a de minimis hurdle, explaining that "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  "The goal of the test is to 'screen out totally groundless claims.'" *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (*quoting Farris v. Sec'y of Health & Human*

---

[3] To the extent Ms. Draine intended to assert separate arguments under SSR 19-4p or Listing 11.02 when she asserted "the ALJ not only failed to find that her headaches were a severe impairment, but he also failed to analyze [Ms.] Draine's headaches in accordance with the appropriate Ruling" (ECF Doc. 8, pp. 11-12), the arguments were not adequately developed and are deemed waived.  *See Hollon*, 447 F.3d at 491; *McPherson*, 125 F.3d at 995.

*Servs.*, 773 F.2d 85, 89 (6th Cir.1985)).  Although the standard is de minimis, it is recognized that a diagnosis alone "says nothing about the severity of the condition."  *Higgs*, 880 F.2d at 863; *see also Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of those impairments, however, does not establish that [claimant] was significantly limited from performing basic work activities for a continuous period of time.").

Where, as here, an ALJ has identified both severe and nonsevere impairments, the Sixth Circuit has held that it was not reversible error for an ALJ to find impairments nonsevere since the Commissioner may still consider the nonsevere impairments in assessing the RFC.  *See Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Anthony*, 266 F. App'x at 457 (finding it "legally irrelevant" that some impairments were not deemed severe where the designation of other impairments as severe "cleared step two of the analysis" and thus caused the ALJ to consider both "severe and nonsevere impairments in the remaining steps of the sequential analysis"); *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003) (finding "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence" when ALJ found a severe impairment at step two).

In contrast, the Sixth Circuit has indicated it may be reversible error if an ALJ fails to consider nonsevere impairments in assessing the RFC.  *See Simpson v. Comm'r of Soc. Sec.,* 344 F. App'x 181, 190–191 (6th Cir. 2009) (distinguishing *Maziarz* and finding reversible error when an ALJ found a nonsevere mental impairment "would not be considered in assessing her RFC"); *Dudley v. Comm'r of Soc. Sec.,* No. 2:16-CV-0682, 2017 WL 2374432, at *4 (S.D. Ohio June 1, 2017) (finding error was not harmless when mental impairments were found nonsevere and the ALJ "did not take any mental impairments or limitations into account" in the RFC), *report and recommendation adopted*, No. 2:16-CV-682, 2017 WL 2645962 (S.D. Ohio June 20, 2017);

33

*compare Pompa,* 73 F. App'x at 803 (applying harmless error standard where "ALJ considered

all of [plaintiff]'s impairments in her residual functional capacity assessment finding").

### ii.      Whether ALJ Erred in Finding Migraines Nonsevere

The ALJ provided the following explanation for his finding at Step Two that Ms.

Draine's migraine headaches (and other impairments) were nonsevere:

> There is objective evidence in the medical record of impairments that are non-severe in that such impairments establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the claimant's ability to meet the basic demands of work activity []. Specifically, the claimant has been evaluated and treated for migraine headaches, insomnia, and polycystic ovarian syndrome []. <u>However, these conditions were being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance</u>. <u>Furthermore, no aggressive treatment was recommended or anticipated for these conditions</u>. Accordingly, the claimant's medically determinable impairments of migraine headaches, insomnia, and polycystic ovarian syndrome are non-severe.

(Tr. 18 (emphasis added) (citations omitted).)  Thus, the ALJ offered clear reasoning for his

finding that Ms. Draine's migraine headaches were medically determinable but would have "no

more than minimal effect" on her ability to work.  (*Id.*)  The finding was also consistent with the

medical opinion of consultative examiner Dr. Fuentes, which the ALJ found persuasive.[4]  (Tr.

25.)  Despite finding Ms. Draine's migraine headaches nonsevere, the ALJ went on to explain

that he had nevertheless "considered the functional limitations resulting from all of the

claimant's medically determinable impairments, including those that are nonsevere" in

determining Ms. Drain's RFC.  (Tr. 18-19.)  He also included an environmental limitation

precluding "exposure to high concentrations of dust, fumes, and smoke" in the RFC.  (Tr. 22.)

Because the ALJ concluded that the evidence did not support more than minimal

limitations in Ms. Draine's ability to perform basic mental work activities (Tr. 18), considered all

---

[4] Ms. Draine has not challenged the ALJ's persuasiveness finding as to this medical opinion.

severe and nonsevere impairments in assessing the RFC (Tr. 18-19), and adopted an RFC with environmental limitations (Tr. 22), the Court finds no reversible error in the ALJ's finding that Ms. Draine's migraine headaches were nonsevere.

Ms. Draine argues that the ALJ erred in finding her migraine headaches nonsevere because "the record established the headaches and their frequency."  (ECF Doc. 8, p. 12.)  In support, she cites to medical records from her psychiatric medication management and psychotherapy office visits, where she complained to psychiatric providers of ongoing difficulties with migraines.  (*Id.* at pp. 11-12.)  While she told those providers about treatment she reported receiving from neurologists and headache specialists, she has not referred this Court to any treatment records directly from the specialists who treated her headaches.  Thus, any consideration of severity, frequency, treatment modalities, compliance with treatment, efficacy of treatment, and other factors relating to this impairment must be based almost entirely on Ms. Draine's reports to psychiatric providers who were not directly treating the impairment.

Even taking Ms. Draine's self-reported descriptions of her treatment at face value, while she reported ongoing migraines, treatment with neurology, and prescribed medications and infusions (*see, e.g.*, Tr. 579, 620, 866, 967, 979), there was some question whether the headaches were related to psychiatric prescriptions or other medical conditions (*see, e.g.,* Tr. 620, 866, 886, 979).  Ms. Draine also reported that she only needed to take her migraine-onset medication once every two to three weeks.  (Tr. 620.)  In this context, the Court cannot find that the ALJ lacked substantial evidence to support his conclusion that Ms. Draine's migraine headaches "were being managed medically, and should be amenable to proper control by adherence to recommended medical management and medication compliance," and that "no aggressive treatment was recommended or anticipated" for that condition.  (Tr. 18.)

35

For the reasons set forth above, the Court finds that Ms. Draine has not met her burden to prove that the ALJ committed harmful error or lacked substantial evidence to support his finding that Ms. Draine's migraine headaches were a nonsevere impairment that would have no more than a minimal effect on her ability to work.  Accordingly, the Court finds Ms. Draine's first assignment of error is without merit.

**C.**     **Second Assignment of Error: Whether ALJ Erred in Following Appeals Council Order of Remand**

In her second assignment of error, Ms. Draine argues that the ALJ erroneously failed to follow the January 4, 2021 Order of Appeals Council which remanded the prior June 2020 ALJ Decision.  (ECF Doc. 8, pp. 12-17.)  In particular, she argues that the ALJ failed to fully comply with the following two instructions from the Appeals Council:

- Evaluate and determine whether the claimant's fibromyalgia, migraine headaches, polycystic ovarian syndrome, and insomnia are severe impairments and whether they result in any work related limitations.

- Give further consideration to the Listing of Impairments and provide rationale with specific references to evidence of record in support of the assessed limitations.

(Tr. 140.)

As to the first instruction, Ms. Draine argues: "Although the ALJ discussed the obesity, fibromyalgia, and migraines headaches (Tr. 17-18), he failed to support his conclusions with substantial evidence as some of these impairments affected his ability to meet the basic demands of work activity."  (ECF Doc. 8, p. 13.)  In support, she cites to various records reflecting that she complained to her psychiatric providers about headaches and associated symptoms.  (*Id.*) Since she acknowledges that the ALJ *did* comply with the Appeals Council's instruction to determine the severity of the specified impairments (*id.*), this assignment of error effectively reiterates her argument from the first assignment of error that the ALJ's assessment of the

severity of her migraine headaches lacked the support of substantial evidence.  For the reasons set forth in Section VI.B.2., *infra*, the Court finds this argument lacks merit.

As to the second instruction, Ms. Drain argues "the ALJ failed to comply with the Order of Remand and evaluate her anxiety under Listing 12.06."  (ECF Doc. 8, p. 13.)  Effectively, Ms. Draine is arguing that the ALJ erred in finding she did not meet the requirements of Listing 12.06.  (*Id.* at pp. 13-17.)  The Commissioner argues in response that the ALJ appropriately explained his basis for finding Ms. Draine's anxiety did not meet Listing 12.06, and that his finding was supported by substantial evidence.  (ECF Doc. 9, pp. 15-16.)

The January 2021 Order of Appeals Council made the following findings regarding the ALJ's prior consideration of Listing 12.06 in the prior ALJ decision:

> The Administrative Law Judge found that the claimant's anxiety continued to be a severe impairment after the claimant reached age 18.  However, the Administrative Law Judge did not evaluate the impairment under Listing 12.06.  Treatment notes indicate that the claimant complained of anxiety, difficulty controlling worry, sleep disturbances due to worry, panic attacks, difficulty going places, and social avoidance.  Treating providers observed that the claimant was distractible due to anxiety, and diagnosed the claimant with an unspecified anxiety disorder. Therefore, consideration of Listing 12.06 is necessary.

(Tr. 140 (internal citations omitted).)   The Appeals Council therefore instructed the ALJ to "[g]ive further consideration to the Listing of Impairments" on remand.  (*Id.*)  On remand, the ALJ provided the following discussion of Listing 12.06 at Step Three:

> The severity of the claimant's mental impairments, considered singly and in combination, does not meet or medically equal the criteria of listings 12.04, 12.06, and 12.08. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in extreme limitation of one, or marked limitation of two, of the four areas of mental functioning. The four areas of mental functioning are: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. An extreme limitation is an inability to function in the area independently, appropriately, effectively, and on a sustained basis. A marked limitation is a seriously limited ability to function in the area independently, appropriately, effectively, and on a sustained basis.

In evaluating the "B" Criteria, in understanding, remembering, or applying information, the state agency consultant determined she had a mild limitation (Exhibit 3A). I do not find that persuasive. The consultative examiner opined the claimant would have difficulty in this Domain due to her depression. I agree. Therefore, I find she has a moderate limitation.

In interacting with others, the claimant has moderate limitation. This was the opinion of the state agency consultant, and I find this persuasive. She has difficulty interacting with others, but she is able to babysit and to date.

With regard to concentrating, persisting, or maintaining pace, the claimant has moderate limitation. This was the opinion of the state agency consultant, and I find this persuasive. The claimant's depression would interfere with her persistence though the claimant has an average intelligence.

As for adapting or managing oneself, the claimant has moderate limitation. This was the opinion of the state agency consultant, and I find this persuasive. The claimant's counselor reports the claimant is "stable."

Because the claimant's mental impairments do not cause at least one "extreme" limitation or two "marked" limitations, the "paragraph B" criteria are not satisfied.

I have also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life. The claimant does not require a structured environment to function.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96 -8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the "paragraph B" mental function analysis.

(Tr. 21-22.)  Thus, the ALJ gave further consideration to the Listing of Impairments—including

Listing 12.06—in the present decision, as instructed.  Ms. Draine's argument that the ALJ did

not follow the Appeals Council's order is not well-taken in this regard. The Court therefore turns to whether the ALJ's consideration of Listing 12.06 was supported by substantial evidence.

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Under the sequential analysis, the claimant retains the burden of proof at Step Three. *See Walters*, 127 F.3d at 529. To prove disability, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

Listing 12.06 deals with anxiety and obsessive-compulsive disorders. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.06. Listings in the 12.00 subset contain two categories of criteria, paragraph B and paragraph C criteria, which is an analysis used to rate the severity of mental impairments in four general areas of functioning at Steps Two and Three of the sequential evaluation process. 20 C.F.R. §§ Pts. 404, 416. Paragraph B defines four broad mental functional areas: "Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself," and requires that a claimant show extreme limitation in one area, or marked limitation in two areas in order to meet a listing. 20 C.F.R. § 404.1520a(c)(3), *see also* 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E. As Ms. Draine's argument is focused on the B criteria, only those criteria will be addressed herein.

Ms. Draine argues that the ALJ erred in his assessment of the B criteria for Listing 12.06 because the evidence—as outlined in her brief—established that she was "seriously limited in her ability to concentrate, persist or maintain pace and adapt or manage herself." (ECF doc. 8, pp. 14-15.) She specifically emphasizes record evidence showing recurrent suicidal thoughts and

two psychiatric hospitalizations as an adult, noting that the ALJ acknowledged hospitalizations in 2013, 2016, 2017, and 2018, but did not mention her hospitalization in 2019.  (*Id.*)  Other than the 2019 hospitalization, she does not identify any specific medical findings or record evidence that the ALJ mischaracterized or failed to address in his decision; instead, she summarizes and generally discusses evidence in the record that she believes supports a finding that she was "seriously limited" in two areas of mental functioning.  (*Id.* at pp. 13-17.)

"'The substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakely*, 581 F.3d at 406 (internal citation omitted).  Thus, even if a preponderance of the evidence supports a finding that Ms. Draine was "seriously limited" in two areas of mental functioning, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.  The question is not whether the evidence highlighted in Ms. Draine's brief supports a finding that she was *seriously* limited in two areas of mental functioning, but whether the ALJ lacked substantial evidence to support his contrary finding that she was *moderately* limited.

In finding Ms. Draine had moderate limitations in all four categories of mental functioning, the ALJ cited to and relied on opinion evidence from the state agency psychological consultants, Ms. Draine's reported symptoms and activities, and treatment notes from LISW Cunningham describing her condition as "stable."  (Tr. 21-22.)  He largely found the state agency consultants' opinions persuasive, except that he found Ms. Draine to be more limited— moderate instead of mild—in her ability to understand, remember, and apply information.  (*Id.*)  He accurately reported that the treatment notes from LISW Cunningham frequently noted that Ms. Draine was "stable."  (*See, e.g.*, Tr. 868-73, 888, 891, 900.)  Later in the opinion, at Step

Four, the ALJ provided a more thorough discussion of Ms. Draine's treatment records, discussing her mental status findings and reported symptoms at various appointments, acknowledging her history of psychiatric hospitalizations and self-injurious behaviors, and summarizing the reports and findings in her 2020 vocational evaluation.  (Tr. 23-25.)  Ms. Draine has not met her burden to show that the ALJ lacked substantial evidence to support his finding that she had moderate limitations in all four categories of mental functioning.

Ms. Draine's assertion that the ALJ did not specifically mention her April 2019 psychiatric hospitalization does not change this analysis.  (*See* ECF Doc. 8, pp. 15-16.)  The Sixth Circuit has long held that an ALJ need not discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  The question is not whether the ALJ discussed every piece of evidence regarding Ms. Draine's psychiatric treatment, but whether he clearly explained his consideration of the treatment records and made a decision supported by substantial evidence.

Ms. Draine was admitted to Highland Springs Hospital for depression and suicidal ideations from April 22 to April 26, 2019.  (Tr. 482-85, 507.)  She was referred there by her therapist after she reported being off her psychiatric medications and attempting suicide by taking some of her old Prozac.  (Tr. 875.)  Upon admission, she reported feeling suicidal for three weeks, with a suicide attempt three weeks prior by overdosing on sleep medications.  (Tr. 482.)  She also reported not taking her psychiatric medications for the past three weeks.  (*Id.*)  On admission, she exhibited a depressed mood and restricted affect, slow and soft speech, linear and logical thought process, and intact associations; she was oriented, and denied any auditory or visual hallucinations; her judgment was poor and her insight was fair.  (Tr. 483-84.)  She was

41

ultimately discharged home with her mother.  (Tr. 507.)  She was improved at the time of her next medication management and psychotherapy visits (Tr. 593-94, 874) and her condition was noted to be stable by the May 20, 2019 (Tr. 873).

Ms. Draine's only argument regarding the 2019 hospitalization is that it is "interesting to note" that the ALJ mentioned other hospitalizations but not this one.  (ECF Doc. 8, pp. 15-16.)  In fact, the ALJ summarized both the history and clinical findings collected during the 2019 hospitalization; it was in this context that he noted the prior hospitalizations.  (Tr. 23.)  Ms. Draine does not clearly articulate how the ALJ's failure to specifically acknowledge a four-day hospitalization after a period of medication noncompliance—while acknowledging a history of similar hospitalizations and accurately summarizing applicable clinical findings—could deprive the ALJ's Step Three findings of the support of substantial evidence.  The Court finds, to the contrary, that the ALJ's Step Three findings were supported by substantial evidence.

For the reasons set forth above, the Court finds Ms. Draine has not met her burden to show that the ALJ failed to follow the Appeals Counsel's order, and has not met her burden to show that the ALJ erred in finding she did not meet Listing 12.06.  Accordingly, the Court finds the second assignment of error to be without merit.

**D.      Third Assignment of Error: Whether ALJ Erred in Assessing Persuasiveness of Treating Source Opinions of LISW Cunningham and CNS Pacer**

In her third assignment of error, Ms. Draine argues that the ALJ erred when he did not find the medical opinions of treating therapist LISW Cunningham and treating medication management provider CNS Pacer to be "persuasive."  (ECF Doc. 8, pp. 17-23.)  The Court will address the ALJ's findings with respect to each of the treating opinions in turn.

### 1.      Framework for Evaluation of Medical Opinion Evidence

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

2.  **Whether ALJ Erred in Assessing Persuasiveness of Treating Therapist LISW Cunningham's Opinion**

Ms. Draine argues that it was harmful and reversible error for the ALJ not to find LISW Cunningham's opinion persuasive, and not to incorporate her opined limitations into the RFC. (ECF Doc. 8, p. 19.)  Despite acknowledging that the ALJ noted LISW Cunningham's failure to provide a narrative to support the "extreme limitations" in her opinion and found her opinion unpersuasive (*id.* (citing Tr. 26)), Ms. Draine argues that LISW Cunningham's therapy records "both supported and were consistent with" her opinion (*id.*).  In support, she highlights therapy records documenting her complaints of migraines, sleep problems, suicidal thoughts and attempts, fibromyalgia and chronic pain, increased depression, chronic fatigue, and agoraphobic thinking.  (*Id.*)  The Commissioner argues in response that the ALJ's decision was supported by substantial evidence and in accordance with the regulations.  (ECF Doc. 9, pp. 17-19.)

Before assessing the persuasiveness of LISW Cunningham's opinion, the ALJ first acknowledged Ms. Draine's subjective complaints (Tr. 22), detailed specific findings from her treatment records (Tr. 23-25), and discussed the persuasiveness of other medical opinions (Tr. 25-26).  In particular, the ALJ found the state agency psychological consultants' findings of no more than moderate limitations to be persuasive in light of the consultants' program knowledge, specified clinical examination findings, and Ms. Draine's reported activities.  (Tr. 25.) The ALJ then provided the following analysis of LISW Cunningham's opinion:

> The report of Kelly Cunningham, LISW, is <u>unpersuasive</u>. <u>She completed a checklist type form</u> checking almost entirely the box noting the claimant has "no useful ability to function," or "unable to meet competitive standards." (See Exhibit 13F). <u>She provides no narrative to support these extreme limitations</u>, <u>which are inconsistent with the record</u>. For these reasons, these excessive limitations are unsupported by the record, and this form is unpersuasive.

(Tr. 26 (emphasis added).)

44

The ALJ addressed supportability—the extent to which LISW Cunningham's own objective findings and supporting explanations substantiate or support her opinions—when he noted that: she completed a checkbox form where almost every checked box noted "no useful ability to function" or "unable to meet competitive standards"; she provided no narrative to support those extreme limitations; and the limitations are "inconsistent with" and "unsupported by" her own treatment records.  (*Id.*)  The ALJ addressed consistency—the extent to which LISW Cunningham's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record—when he found her "extreme" or "excessive" limitations were "inconsistent with" and "unsupported by" the remainder of the evidentiary record.  (*Id.*)

Without identifying any specific errors in the ALJ's analysis or specific evidence that the ALJ misrepresented or failed to adequately address, Ms. Draine simply summarizes certain records and argues that LISW Cunningham's opinion "was supported by and consistent with her regular counseling appointments with [Ms.] Draine.[]"  (ECF Doc. 8, pp. 19-21.)  This argument misapprehends the applicable legal standard.  Even if a preponderance of the evidence supports a finding that LISW Cunningham's opinion is persuasive, this Court cannot overturn the ALJ's finding to the contrary "so long as substantial evidence also support[ed] the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477; *Blakley*, 581 F.3d at 406.

Regardless of whether there was evidence to support a finding that the significant limitations identified in LISW Cunningham's opinion were persuasive, the question before this Court is whether there was substantial evidence to support the ALJ's finding to the contrary. Even considering the evidence highlighted in Ms. Draine's brief, the Court finds she has not met her burden to show that the ALJ's persuasiveness finding lacked the support of substantial evidence.  Ms. Draine highlights her subjective symptom reports to LISW Cunningham and CNS

Pacer (ECF Doc. 8, pp. 19-20), which the ALJ acknowledged throughout his decision (Tr. 22-25).  She highlights her prior psychiatric hospitalizations (ECF Doc. 8, p. 20), which the ALJ acknowledged and discussed in his decision (Tr. 23).  She notes her psychiatric diagnoses (ECF Doc. 8, p. 20), which the ALJ acknowledged and found severe (Tr. 17, 23).  She highlights the findings in a report from Opportunities for Ohioans with Disabilities (ECF Doc. 8, pp. 20-21), which the ALJ discussed at length (Tr. 24-25).  She discusses the medical opinions of consultative psychiatric examiner Dr. Cooper and the state agency psychological consultants (ECF Doc. 8, pp. 21-22), which the ALJ assessed for persuasiveness (Tr. 26).[5]

The questions before this Court are whether the ALJ considered the full record in evaluating the persuasiveness of LISW Cunningham's opinion, appropriately articulated his reasons for finding the opinion unpersuasive, and made a determination that was supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings regarding medical opinions); 20 C.F.R. § 404.1520(e) (findings regarding RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405 ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

For the reasons stated above, the undersigned finds Ms. Draine has not met her burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of LISW Cunningham's opinion, that he failed to sufficiently articulate his reasons for finding the opinion "not persuasive," or that his persuasiveness finding lacked the support of substantial evidence.  Ms. Draine's conclusory arguments that "the ALJ failed to address the contrary

---

[5] To the extent Ms. Draine intended to also assert a separate challenge to the ALJ's finding that the state agency opinions were persuasive (*see* ECF Doc. 8, pp. 21-22), that argument was not clearly articulated or adequately developed and is deemed waived.  *See Hollon*, 447 F.3d at 491; *McPherson*, 125 F.3d at 995

evidence establishing support and consistency" and "offered an inadequate analysis . . . and failed to proffer a coherent explanation" (ECF Doc. 8, p. 22) do not alter this analysis.

### 3. Whether ALJ Erred in Assessing Persuasiveness of CNS Pacer's Opinion

Finally, Ms. Draine argues that the ALJ's finding regarding the persuasiveness of CNS Pacer's opinion was harmful error because "[i]t is unclear whether the ALJ found this opinion persuasive or unpersuasive as both were noted." (ECF Doc. 8, p. 15.) In his decision, the ALJ provided the following analysis of the two treating provider opinions:

> The report of Kelly Cunningham, LISW, is unpersuasive. She completed a checklist type form checking almost entirely the box noting the claimant has "no useful ability to function," or "unable to meet competitive standards." (See Exhibit 13F). She provides no narrative to support these extreme limitations, which are inconsistent with the record. For these reasons, these excessive limitations are unsupported by the record, and this form is unpersuasive.
>
> Likewise, the report of Kyra Pacer, CNS, is persuasive. This was also a checklist-type form, providing no narrative or explanation for her opinions. She did not, at worst, that the claimant would be seriously limited but not precluded from some mental functional limitations. (See Exhibit 14F). While the findings are more consistent with the record, the lack of explanation in the checklist form renders it unpersuasive.

(Tr. 26 (emphasis added).) The Commissioner argues in response that the ALJ clearly found the opinion to be "unpersuasive," and that his "statement that [CNS] Pacer's opinion 'is persuasive' is clearly a scrivener's error." (ECF Doc. 9, p. 20.) The Commissioner further argues that the ALJ's persuasiveness finding was supported by substantial evidence. (*Id.* at pp. 19-20.)

The Court agrees that, in context, it is clear that the ALJ intended to find CNS Pacer's opinion unpersuasive. The ALJ's use of the word "[l]ikewise" immediately after finding LISW Cunningham's opinion unpersuasive, his similar emphasis on CNS Pacer's use of a checklist form without a narrative or explanation, and his ultimate conclusion that "the lack of explanation in the checklist form renders it unpersuasive" all serve to indicate that it was the ALJ's intent to find CNS Pacer's opinion unpersuasive. The ALJ's initial contradictory statement that CNS

Pacer's opinion was "persuasive" was a harmless scrivener's error.  *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (finding harmless error analysis applies in the social security disability context).

Although Ms. Draine does not challenge the ALJ's persuasiveness finding as to CNS Pacer's opinion *except* to argue that it was unclear whether the ALJ found the opinion persuasive or unpersuasive (ECF Doc. 8, p. 15), the undersigned also observes that the ALJ addressed supportability and consistency as required by the regulations, and sufficiently explained his basis for finding the opinion unpersuasive.  He observed that the limitations checked on CNS Pacer's form were "at worst, that the claimant would be seriously limited but not precluded from some mental functional limitations" and therefore "more consistent with the record" (consistency) but found the use of a checkbox form without adequate narrative or explanation (supportability) ultimately rendered the opinion unpersuasive.

For the reasons stated above, the undersigned finds Ms. Draine has not met her burden to show that the ALJ failed to consider the entire record when evaluating the persuasiveness of CNS Pacer's opinion, that he failed to sufficiently articulate his reasons for finding the opinion "not persuasive," or that his persuasiveness finding lacked the support of substantial evidence. Accordingly, the Court finds Ms. Draine's third assignment of error is without merit.

### VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.


March 8, 2024


*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge